1

2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

3

4

5

6

7

8

DEBORAH R. CLAY,

        Plaintiff,

  v.

MICHAEL J. ASTRUE,

        Defendant.

No.  C 06-05032 SBA

**ORDER**

[Docket Nos. 15, 17]

9

10

**REQUEST BEFORE THE COURT**

11

      Before the Court is plaintiff Deborah R. Clay's Motion for Summary Judgment (the

12

"Motion") [Docket No. 15] and defendant's Cross Motion for Summary Judgment and In Opposition

13

to Plaintiff's Motion for Summary Judgment (the "Opposition") [Docket No. 17]. Clay appeals

14

defendant's decision she is neither disabled nor eligible for disability or supplemental security

15

income benefits under Subchapters II or XVI, respectively, of the Social Security Act, 42 U.S.C.

16

§ 301 *et seq.*[1]

17

      For the reasons discussed in this Order, the Court finds defendant erred in making its

18

determination, in the first and fourth steps of the Social Security Administration's five-step

19

disability analysis, under 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4).  More specifically, and as

20

detailed below in this Order, with regards to the first step of the analysis, the Court finds there is not

21

substantial evidence to support defendant finding Clay engaged in substantial gainful activity

22

through August 22, 2002.  With regards to the fourth step of the analysis, the Court finds there is not

23

substantial evidence to support the residual functional capacity ("RFC") determined by defendant.

24

Further, the Court also finds defendant applied the wrong legal standard in determining Clay's RFC.

25

///

26

27

28

[1]     Subchapter II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, governs old age, survivors, and disability insurance (OASDI) benefits, while subchapter XVI, 42 U.S.C. § 1381 *et seq.*, governs Supplemental Security Income for the aged, blind, and disabled.

1    Lastly, the Court finds defendant applied the wrong legal standard in determining Clay's past

2    relevant work.

3          Accordingly, the Court GRANTS the Motion, DENIES the Opposition, REVERSES

4    defendant's decision regarding whether Clay is eligible for disability or supplemental security

5    income benefits, and REMANDS this matter back to defendant to take certain actions, including

6    holding an administrative hearing to redetermine Clay's RFC and past relevant work, in accordance

7    with the Court's findings and conclusions stated herein.

8                                    **BACKGROUND**

9    **I.    1952-2002**

10         Clay was born in 1952.  Docket No. 10 at 63 (Admin. Record ("AR")).  She completed the

11   twelfth grade in 1980.[2]  AR at 80.  From 1987 through 1993, she rose from housekeeper to floor

12   supervisor, at the Shattuck Hotel in Berkeley, then in 1997, worked as a stadium usher at the

13   Oakland Coliseum for six months, then from 1998 or 1999 through 2002, was a certified nursing

14   assistant at the Kyakameena Sanatorium in Berkeley.  AR at 70, 76, 85, 287-89; *see also* AR

15   at 67-71.  On January 21, 2002, while assisting a sanatorium patient from a bed to a wheelchair, the

16   patient grabbed Clay around her neck, who then experienced a sharp pain on the left side of her

17   neck.  AR at 22, 76, 215.  She presented that same day at a Kaiser Permanente emergency room.  AR

18   at 207 para. 2 (Admin. Hr'g Ex. ("Ex.") "F10").

19         **A.    Kaiser Permanente**

20         From January 24, 2002 through June 19, 2002, Clay had fourteen visits with the

21   Occupational Medicine Clinic at Kaiser Foundation Hospital East Bay ("Kaiser").  AR at 128-61

22   (Ex. "F1").  Her initial physical examination on January 24, 2002 found pain on cervical flexion or

23   left rotation, with good extension, and no spurling.  AR at 160.  The doctor also found tender

24   cervical muscles, including the right trapezius, and tender medial thoracic muscles, but no spine

25   tenderness.  *Id.*  And, the doctor found Clay's shoulders had full range of motion with no tenderness,

26   her lumbar had full range of motion, and she had no problem performing a straight leg raise.  *Id.*  He

27   ───────────────

28   [2]      The Administrative Record does not indicate if this was through a G.E.D. or a continuation
         program.

                                        2

1  diagnosed a cervical thoracic strain, and recommended medication and physical therapy, with a

2  follow-up visit in one week.  *Id.*  He also coded Clay's work status as "modified."  *Id.* at 161.

3       On March 8, 2002, Clay had an MRI.  AR at 206 (Ex. "F9").  As a result, Kaiser physicians

4  noted a 3-mm broad-based C4-5 disc protrusion, left greater than right, resulting in a slight left

5  anterior cord impingement.  *Id.* at 146, 206.  In April, Clay began using a cervical collar for pain,

6  and doctors added acupuncture to her treatments.  *Id.* at 141-42.

7       On June 19, 2002, Clay had her final Kaiser visit, as her treatment was transferred for

8  reasons not indicated, to Rovner, M.D.[3]  *Id.* at 128.  An examination on this date found pain and

9  tightness across Clay's upper back with end-range range of motion, but no spurling.  *Id.*  The

10 diagnosis was cervical neck disease, which had improved as expected.[4]  *Id.* at 129.  The doctor

11 recommended continued medication and acupuncture, and coded Clay's work status as "modified."

12 *Id.*  Her transfer sheet indicated she could lift or carrying no more than ten pounds, and should not

13 attempt anything heavier.  *Id.* at 216 (Ex. "F12").  She had no restrictions, however, on standing,

14 walking, sitting, or driving.  *Id.*

15     **B.**    **Ortho-East:  An Orthopaedic Medical Group, Inc. - Michael E.**

16           **Hebrard, M.D.**

17      On July 22 or 25, 2002, Clay saw Michael E. Hebrard, M.D. of Ortho-East:  An Orthopaedic

18 Medical Group, Inc.  *Id.* at 207, 209-12, 214-15.  He noted she had an intermittent sharp left-sided

19 neck pain with occasional left forearm pain, impaired light touch sensation in her left hand, and

20 minimal upper extremity weakness.  *Id.* at 207 para. 2 (Ex. "F10"); 215 ¶¶ 18-19 (Ex. "F11").  He

21 also found her cervical spine had active and normal range of motion, and he noted her cervical disc

22 dysfunction C4-5 with cord impingement.  *Id.* at 215 ¶¶ 19-20.  He kept her on modified work, with

23 no lifting, pushing, or pulling more than ten pounds, and no neck twisting or turning.  *Id.* at 210, 215

24

25

26     [3]    The Administrative Record does not mention this doctor again.

27     [4]    In her Motion, Clay's counsel indicates this record shows she made "very little

28 improvement," citing to page 128 of the Administrative Record.  Mot. at 11:11.  This was Clay's
statement, however, not Kaiser's.  AR at 128.

¶ 26.  He also modified her medication, referred her to Dr. Delmar Sanders for a second opinion,[5]
and scheduled her for a four-week follow-up visit.  *Id.* at 215 ¶ 23.

On August 22, 2002, Dr. Hebrard diagnosed curved disc C 4-5 protruding and right cervical
radiculitis, without spurling.  *Id.* at 214.  He continued Clay's medication and limitations, told her to
return in four weeks,[6] and referred her to Dr. St. John, a neurosurgeon.  *Id.*

In August 2002, Clay returned to work at the sanatorium, on modified duty, which consisted
of helping to feed patients and passing trays around.  AR at 275.  After two weeks, however, the
Sanatorium told her it would no longer provide her with modified duty and laid her off.  AR at 270,
275.

**C.      James N. St. John, M.D.**

On September 10, 2002, James N. St. John, M.D. evaluated Clay.[7]  *Id.* at 207 para. 1
(Ex. "F10").  She complained of left-side neck pain, accentuated by motion, and a brief period of
left-arm pain and transient right-hand tingling, but no upper extremity weakness.  *Id.* at 207 para. 4.
Examination found no definite limitation of cervical motion, but did find pain with left lateral
motion, affecting the region of the left trapezius.  *Id.* at 208 para. 1.  Palpation tenderness was found
in the medial aspect of the left trapezius but not in the posterior cervical region.  *Id.*  The doctor
diagnosed post-traumatic neck pain associated with MRI scan evidence of C4-5 disc protrusion.  *Id.*
at 208 para. 2.  He concluded she should continue with conservative treatment, and should not return
to strenuous labor, but limit herself to lifting no objects greater than 20 pounds, nor repetitively lift
objects greater than 10 pounds.  *Id.* at 208 para. 4.

**II.      2003 - Workers' Compensation Settlement**

On October 22, 2003, Workers' Compensation awarded Clay $53,000 for a "life long
permanent disability."  *Id.* at 217, 224 (Ex. "F13"), 271.  Through a Workers' Compensation referral,

---

[5]      The Administrative Record does not mention this doctor again.

[6]      The Administrative Record does not indicate whether Clay kept this appointment.

[7]      Although referred by Dr. Hebrard, Dr. St. John's evaluation was performed for the State
Compensation Insurance Fund (SCIF), the sanatorium's Workers' Compensation carrier.  AR at 207,
217-226.  The records also indicate, however, SCIF covered Dr. Hebrard's examinations.  AR at
211, 213-14.

1    she then obtained a certificate, after completing a four- to eight-month course in medical clerical

2    work.  AR at 269-270.[8]  She did not learn how to type, however.  AR at 269-70, 284-85.

3    **III.    2004 - 2005**

4         **A.    Clay applies for benefits with the SSA.**

5         On or about June 8, 2004, Clay filed concurrent applications for Disability Insurance

6    Benefits ("DIB") and Supplemental Security Income ("SSI") with the Social Security

7    Administration (the "SSA").  AR at 63-66, 256-259.  She alleged she became disabled as of January

8    21, 2002, due to lower back and leg problems.  AR at 28-30, 37, 72, 76.  She was insured for DIB

9    until September 30, 2004.[9]  AR at 72.

10        In a Pain Questionnaire dated June 30, 2004, Clay indicated she suffered from lower-back

11   pain as well as shoulder pain, and sometimes left-leg pain.  AR at 82, 84.  She said the pain could be

12   brought on by walking or sitting too much, or from bending, stooping, or climbing steps.  *Id.*  She

13   said her pain could last for 30 to 40 minutes at a time, and that rest could relieve it immediately,

14   while medications, such as Vicodin or Tylenol #3, could address it in about a half hour.  *Id.*  Due to

15   her pain, she said she could only walk or sweep for short periods, before having to rest.  *Id.* at 83.

16   Also, she found it difficult to climb stairs, sometimes having to rest in mid-flight.  *Id.*  She also said

17   she could drive a little, wash the dishes, iron, and wash her clothes.  *Id.*  She said she could no

18   longer jog, take long walks, or engage in her primary hobby, fishing.  *Id.*  Further, pain often made

19   her stop

20   _____

21   [8]    This course may have been taken in 2003 and 2004, or just 2004.  The Administrative
     Record is unclear, and her counsel at that time, who is not her current counsel, did not provide
22   documents which might have indicated the date of completion.  Further, although Clay admitted at
     her hearing to having memory problems, AR at 270, the parties share some responsibility for not
23   better developing her testimony, in her hearing, *see* AR at  264-99.  Nonetheless, the Court has done
     the best it could to determine when certain events occurred.

24
     [9]    DIB are provided to a claimant by premiums funded through their payroll deductions.  AR
25   at 264.  At a certain point after deductions end, the DIB end.  *Id.*  Thus, in order to qualify for DIB, a
     claimant must prove they became disabled while still covered by DIB.  42 U.S.C. § 423(c);
26   *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  In contrast to the date provided by Clay, the
     SSA indicates she was insured for DIB, through December 31, 2003, citing to the Administrative
27   Record at 20 and 264.  Opp'n at 2:10.  The record appears to support both claimed dates.  Neither
     party has indicated the discrepancy is an issue.  The Court notes the alleged impairment onset date
28   of January 21, 2002 precedes both coverage dates, while the ALJ's determined disability onset dates
     in January and March 2005, follow both coverage dates, *see supra* part II.B of the Court's Analysis.

///

what she was doing, and take a break.  *Id.* at 84.  Lastly, she indicated she could walk around the

block, stand for 20 to 30 minutes at a time, and sit for 15 to 20 minutes at a time.  *Id.*

### B.    QTC Medical Group, Inc.

On August 21, 2004, Clay presented at QTC Medical Group, Inc.-OK ("QTC") for a

complete orthopedic evaluation, at the request of the California Department of Social Services,

Disability and Adult Programs Division.[10]  AR at 162 (Ex. "F2").  An examination found a normal

gait, and ability to heel-toe walk, with normal swing and stance phases.  AR at 163.  It also found no

spasm or tenderness of the paravertebral musculature, no spurling, and normal cervical spine

motion.  AR at 164.  The doctor also found a normal spinal contour and no tenderness in the lumbar

paraspinal region.  *Id.*  Her straight leg raise was negative bilaterally, both sitting and supine.  *Id.*

Her shoulder range of motion was within normal limits, with no tenderness, and girdle muscle

strength of 5/5.  *Id.*  Also impingement and Yergason tests were negative for her shoulders.  *Id.*

Other tests for the hands, wrists, elbows, hips, and knees were all unremarkable and within normal

limits.  *Id.*  The doctor concluded Clay had some restriction in her lumbar spine range of motion, but

found no evidence of cervical or lumbar radiculopathy.  AR at 165.  He also concluded Clay could

lift 50 pounds occasionally and 25 pounds frequently; bend and stoop frequently; and, sit, stand,

walk, kneel, climb, or use her upper extremities without limitation.  *Id.*

### C.    Procedural Developments with the SSA

On or about October 22, 2004, the SSA denied Clay's applications for benefits.  AR at 28,

30-34, 260.  On or about November 17, 2004, she timely requested reconsideration, and on or about

January 13, 2005, the SSA affirmed its denial.  AR at 29, 35, 37-42, 261.

### D.    North Oakland Medical Clinic - Bruce Thompson, M.D.

From November 3, 2004[11] through May 23, 2005, Clay had 12 visits at the North Oakland

Medical Clinic ("North Oakland").  AR at 186-99 (Ex. "F7").  Her complaints were generally

---

[10]    State agencies often make the initial determination as to whether a person is disabled or not.
*See* 42 U.S.C. § 421.

[11]    The first visit is indicated as a follow-up visit, but no prior records are provided.  AR at 199.

6

consistent and involved pain in her left leg when bearing weight, lower-back pain, and migraines, for which she took Vicodin.  AR at 187-99.  During this time, her left knee and lumbar were x-rayed on December 23.  AR at 172-73 (Ex. "F5").  The former showed no significant joint disease, while the latter showed no compression deformities, a mild scoliosis and segmentation anomaly, and a possible asymmetrical transitional and narrowing of lumbosacral vertebra.  AR at 173.

On December 29, Clay was given a knee brace and referred for a knee MRI.  AR at 195 (Ex. "F7").  The MRI, done on January 5, 2005, showed a bone lesion involving the posterolateral tibial plateau, most likely a combination of ostenecrosis and subchondral cyst formation.  AR at 194.  On February 28, 2005, North Oakland referred Clay to "ortho."  AR at 189.

**E.      Aubrey A. Swartz, M.D., Pharm. D.**

On March 4, 2005, Clay saw Aubrey A. Swartz, M.D., Pharm. D., an orthopedic surgeon, for the pain in her lower back and both knees.  *Id.* at 176 para. 1 (Ex. "F6").  Clay told the doctor she felt the two issues were independent, as the knee pain was of recent onset, and the neck and lower-back pain were due to an auto accident in 2002.[12]  *Id.*  Clay described headaches and pain in the right cervicothoracic region and in the low back across the lubosacral spine.  *Id.* at 176 para. 6.  She also said her left knee gave out at times.  *Id.*  She also indicated looking at the period from 2003 through her visit, she could bathe herself and get dressed; shop for groceries and lift and carry them, with help; sometimes cook, wash dishes, and iron; clean the house, with help; sweep, mop, or vacuum on rare occasions; and, drive.  AR at 179.  Dr. Swartz reviewed the 2002 MRI and found Clay's spine unremarkable, though he noted the C4-5 disc bulge.  *Id.* at 176 para. 7.  He also reviewed the more recent knee MRI and the lumbar x-ray.  *Id.* at 176 para. 8.

His examination found a reasonable posture, normal lordotic curve, and a level pelvis.  *Id.* at 176 para. 10.  He also found her mildly tender in the cervical spine but no spasm.  *Id.* at 177 para. 1.  And, he found her tender to light touch in the lumbosacral spine, but without spine.  *Id.* at 177 para. 3.  In checking lumbar extension, Clay had too much pain to go beyond five degrees.

---

[12]      The parties do not explain this entry.  Clay's medical records make no other mention of any such accident.  Dr. Swartz's records do show she wanted to avoid categorizing her impairments as work-related, AR at 181, 183, but none of her other records show any indication to do this.

*Id.* at 177, para. 4.  He also found her sensitive to touch in both lower extremities.  *Id.* at 177 para. 5. He found low back pain with a straight leg raise on the right at 30 degrees, and pain in the left posterior thigh or hamstring with a straight leg raise on the left at 40 degrees.  *Id.* at 177 para. 10. He also found low back pain with right knee flexion to 20 degrees and left knee flexion to 35 degrees.  *Id.* at 177 para. 11.  Lastly, he found knee range of motion was 0 to 135 degrees, with cracking sensation on extension, but no tenderness, swelling, effusion, or discoloration in either knee.  *Id.* at 178 para. 1.  Her McMurray test was negative.  *Id.*  Dr. Swartz concluded Clay was "chronically deconditioned with recurrent mechanical strain of the neck, back, and probable early degenerative disease of both knees."  *Id.* at 178 para. 2.  He prescribed an anti-inflammatory, referred her to Alta Bates for physical therapy, and told her to return in two months.[13]  *Id.* at 178 para. 3.

### F.        Bruce Thompson, M.D. and Clay's Employability Examination

In March 2005, Clay had been on General Assistance ("GA") since 2003 or 2004,[14] which required her to look for at least 12 jobs per month.  AR at 271.  After completing her vocational training in 2003 or 2004, she had sought work in the medical clerical field, but never found any.  AR at 269.  She looked for any type of light work or filing position she could find.  AR at 273.  But, she was not sure if she could perform filing, however, as she had never done it.  *Id.*  Then, in 2004 or 2005, back, shoulder, neck, and arm pain, allegedly stemming from her 2002 injury, started to flare up.  AR at 272.

In March 2005, when she found out from a friend she could obtain a medical waiver to avoid the GA's job-seeking requirement, she had an evaluation performed to obtain one.  *Id.* Thus, on March 22, 2005, she had an employability examination with Bruce Thompson, M.D., of North Oakland.  AR at 254-55 (Ex. "F15").  He completed a check-the-box Employability/Medical Statement provided by the Alameda County Social Services Agency.  *Id.*  His diagnosis was chronic low back pain, resulting in limited range of motion, with increased pain with activity.  AR at 254.

---

[13]        The Administrative Record does not indicate whether Clay kept this appointment.

[14]        *See supra* note 8 for a discussion regarding date inaccuracies.

He concluded Clay was "unemployable" for 12 months or more, could lift up to five pounds, and could not climb, bend at the waist, reach, kneel, balance, or do knee bends.  AR at 255.

### G.    Alta Bates Summit Medical Center

On May 24, 2005, the day after her last visit to North Oakland, AR at 187, Clay presented at Alta Bates, AR at 201-03, on a physical therapy referral from Dr. Swartz, AR at 178, para. 3, 202. Unfortunately, due to a loss of coverage, on or about June 5, 2005, Clay was only able to have an initial evaluation.  AR at 201.  The therapist's initial diagnosis was lumbar strain, and her assessment was severe muscle spasms in the lower trunk and lumbar spine area, with trunk and pelvis misalignment.  AR at 203-04.

### H.    West Oakland Health Council

From August 1 through December 2005, Clay had seven visits at West Oakland Health Council ("West Oakland").[15]  AR at 243-53 (Ex. "F14").  An August 5 MRI of her cervical spine showed mild degenerative changes, AR at 244, as did an MRI of her lumbar spine which also showed L5-S1 disc space narrowing, AR at 244-45.  The records are not dictated and partially illegible, but show the following complaints:  August 1:  neck, back, and shoulder pain; August 25: neck and left leg pain, and right thumb numbness; September 9: lower-back pain; October 12:  left-side neck pain and back pain; November 9:  left-shoulder and lower-back pain; December:  same as November 9; unknown date:  right-knee, neck, and lower-back pain.  AR at 243, 246-53.  The only treatment apparently involved various medications.  *Id.*  In addition to ongoing diagnoses regarding lumbar issues, on August 1, September 9, and October 12, the staff diagnosed hemorrhoids, and on August 25, October 12, and the unknown date, the staff diagnosed depression or mood disorder and/or noted a Zoloft prescription.

## IV.    2006

After the SSA affirmed its denial on reconsideration, Clay timely requested a hearing before an Administrative Law Judge (ALJ), and had one on March 2, 2006.  AR at 43.  David Calvert, a

---

[15]    The records for the last two visits are cut off at the top, where the dates are indicated.  The second-to-last visit appears to have been in December.  *See* AR at 252.  It is unknown when the last visit occurred.  *See* AR at 253.  In addition, there are two possible additional visits on October 18 and 20, 2005 for a tetanus and diphtheria shot and a tuberculosis test, respectively.  AR at 250.

1    ///

2    private attorney, represented her.[16]  AR at 19.  In addition, an impartial vocational expert also

3    testified.  AR at 262-99.

4         At her hearing, Clay testified she had migraine "flares" sometimes twice a month and a

5    migraine once a month, which could last all day.  AR at 277.   She also testified she could lift up to

6    ten pounds, AR at 283, could walk around her block, but then she would have to stop, AR at 284,

7    and could sit for about 30 minutes, before needing to stand and stretch, AR at 282.  She also said she

8    could go up stairs slowly, but was concerned about going down them, as her right knee could give

9    out.  AR at 284.  She also said she could groom herself, but had difficulty getting out of the bathtub.

10   AR at 283.

11        As for household tasks, she testified she could clean the bathroom and the kitchen.  AR

12   at 279.  Her adult daughter, with whom she lived, did her own room and the vacuuming and the

13   dusting.  *Id.*  With regards to the kitchen, Clay said could clean the top of the refrigerator, but for

14   cleaning the bottom, she had to use a chair or bend down on her knees.  AR at 283.  She also said

15   she could not do these tasks without resting during them.  *Id.*  As for the laundry, she could load the

16   washer, but her daughter transferred the wet clothes to the dryer, though Clay could later unload and

17   fold them.  AR at 279.  She also indicated she did minimal cooking, and once a month, she and her

18   daughter went to the grocery store, where her daughter carried any heavy objects.  AR at 280.  Also,

19   on a daily basis, Clay said she drove around Berkeley to visit friends, with whom she might watch

20   television or take walks, and occasionally visited her mother in Oakland.  AR at 280-82.

21        On March 15, 2009, the ALJ affirmed the denial.  AR at 18-27.  Clay requested the SSA's

22   Appeals Council to review the ALJ's decision.  AR at 7-9.  On June 23, 2006, the Council denied

23   her request.  AR at 4-6.

24        On August 21, 2006, Clay timely sued the SSA, pro se, for judicial review, under 42 U.S.C.

25   §§ 405(g) and 1383(c)(3).  *See* Docket No. 1.  Her current counsel substituted in, on August 1, 2007.

26    *See* Docket No. 14.  On February 29, 2008, Clay filed her Motion, alleging five errors for review.

27

28   [16]      This is not her current attorney.

1   Specifically, she claimed the ALJ improperly rejected the opinions of her treating and examining

2   physicians, improperly evaluated her credibility, incorrectly determined her residual functional

3   capacity, failed to take expert testimony as required by Social Security Ruling 96-6p, and incorrectly

4   found her 2002 employment was "substantial gainful activity."  Mot. at 5 ¶¶ 1-5.

5                                   **LEGAL STANDARD**

6   **I.      Standard of Review**

7           The substantial evidence standard governs a district court's review of a final decision made

8   by the Commissioner of the SSA.  As 42 U.S.C. § 405(g) states:

9                   Any individual, after any final decision of the Commissioner of Social

10                  Security made after a hearing to which he was a party ... may obtain a review of such

11                  decision by a civil action ....  As part of the Commissioner's answer the

12                  Commissioner of Social Security shall file a certified copy of the transcript of the

13                  record including the evidence upon which the findings and decision complained of

14                  are based.  The court shall have power to enter, upon the pleadings and transcript of

15                  the record, a judgment affirming, modifying, or reversing the decision of the

16                  Commissioner of Social Security, with or without remanding the cause for a

17                  rehearing.  The findings of the Commissioner of Social Security as to any fact, *if*

18                  *supported by substantial evidence,* shall be conclusive ....

19  42 U.S.C. § 405(g) (emphasis added); *Udd v. Massanari*, 245 F.3d 1096, 1100 (9th Cir. 2001);

20  *Evans v. Chater*, 110 F.3d 1480, 1483 (9th Cir. 1997).

21  When the Appeals Council declines to review an ALJ's decision, it stands at the Commissioner's

22  final decision.  *Bass v. Social Sec. Admin.*, 872 F.2d 832, 832 (9th Cir. 1989).

23          A court may reverse an ALJ if his or her findings "are based on legal error or are not

24  supported by substantial evidence." *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002).

25  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable

26  person might accept as adequate to support a conclusion." *Evans*, 110 F.2d at 1483 (quoting

27  *Flaten v. Sec'y of Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  "Substantial

28  evidence is 'more than a mere scintilla,' but 'less than a preponderance.' " *Evans*, 110 F.2d at 1483

1    (quoting *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) (citations omitted)).  "If the record

2    considered as a whole can reasonably support either affirming or reversing the Commissioner's

3    decision [a court] must affirm."  *McCartey*, 298 F.3d at 1075.

4    **II.        The Five-Step Disability Inquiry**

5                    To establish a claimant's eligibility for disability benefits under the Social

6            Security Act, it must be shown that:   (a) the claimant suffers from a medically

7            determinable physical or mental impairment that can be expected to result in death or

8            that has lasted or can be expected to last for a continuous period of not less than

9            twelve months; and (b) the impairment renders the claimant incapable of performing

10           the work that the claimant previously performed and incapable of performing any

11           other substantial gainful employment that exists in the national economy.  *See* 42

12           U.S.C. § 423(d)(2)(A).   If a claimant meets both requirements, he or she is

13           "disabled."

14   *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see* 42 U.S.C. §§ 416(i), 423(d), 1382c(3)(A).

15           "The SSA regulations provide a five-step sequential evaluation process for determining

16   whether a claimant is disabled [within the meaning of the Social Security Act].   20 C.F.R.

17   §§ 404.1520, 416.920.[17]  The claimant has the burden of proof for steps one through four, and the

18   Commissioner has the burden of proof for step five."  *Bustamante v. Massanari*, 262 F.3d 949, 953-

19   54 (9th Cir. 2001).

20                   The five steps of the inquiry are:

21           1.        Is claimant presently working in a substantially gainful activity?  If so,

22   then the claimant is not disabled within the meaning of the Social Security Act.  If

23   not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

24           2.        Is the claimant's impairment severe?  If so, proceed to step three.  If

25   not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

26   _____

27   [17]      All regulatory citations herein are to the 2008 Code of Federal Regulations.  The 404-series
     regulations in title 20 address DIB, while the 416-series regulations address SSI.  The two series

28   have many regulations which parallel each other or are similar in content.  Hence, they are often
     cited together, in cases where as here, a claimant has applied for both DIB and SSI.

1   ///

2        3.        Does the impairment "meet or equal" one of a list of specific

3   impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is

4   disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d)

5        4.        Is the claimant able to do any work that he or she has done in the past?

6   If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§

7   404.1520(e), 416.920(e).

8        5.        Is the claimant able to do any other work?  If so, then the claimant is

9   not disabled.  If not, then the claimant is disabled. See 20 C.F.R. §§ 404.1520(f),

10   416.920(f).

11   *Bustamante*, 262 F.3d at 954.

12                              **ANALYSIS**

13        For the following reasons, the Court holds the ALJ erred in steps one and four of the SSA's

14   five-step analysis, and remands for a redetermination of findings and conclusions for the fourth step

15   of the analysis.

16   **I.        There was not substantial evidence to support the ALJ finding Clay engaged in**

17   **substantial gainful activity through August 22, 2002.**

18        A person who performs substantial gainful activity ("SGA") is not disabled.  20 C.F.R.

19   §§ 404.1520(b), 416.920(b).  "Substantial gainful activity is work activity that is both substantial,

20   i.e., involves significant physical or mental activities, and gainful, i.e., work activity performed for

21   pay or profit.  *See* 20 C.F.R. § 404.1572."  *Tackett*, 180 F.3d at 1098 n.4.  It involves doing

22   significant physical or mental activities.  20 C.F.R. §§ 404.1572(a), 416.972(a).  Actual pay or profit

23   is not required.  *Id.* §§ 404.1572(b), 416.872(b).  An individual who exceeds certain earning

24   amounts set in the C.F.R. is presumed able to engage in substantial gainful activity.  *Id.* §§

25   404.1574, 404.1575, 416.974, 416.975.

26        The ALJ found Clay sustained a workplace injury on January 21, 2002, the date she alleged

27   she became disabled.  AR at 22 para. 6.  He also found she was released to work on modified duty

28   on July 25, 2002, and returned to work in early August 2002, but then her employer eliminated

1   modified duty, and laid her off, on August 22, 2002.  *Id.*  Subsequently, she looked for other work,

2   undertook vocational rehabilitation, and looked for work again.  *Id.*  The ALJ thus concluded Clay

3   stopped working in 2002, not due to any alleged impairments, but because she was laid off.  *See id.*

4   Applying 20 C.F.R. § 404.1520(b) and § 416.920(b), he thus found her work in August 2002 was

5   substantial gainful activity ("SGA"), and not an unsuccessful work attempt ("UWA").  *Id.*  He did

6   not, however, find she performed any SGA after August 2002.  AR at 22 para. 6 - 23 para. 1.

7          Clay argues, based on these facts, her August 2002 work was not SGA, but was a UWA, and

8   points the Court to Social Security Ruling ("SSR") 05-02.  Mot. at 17:11-20.  SSR 05-02 discusses

9   how to distinguish SGA from a UWA, and draws its authority from, *inter alia*, 20 C.F.R. § 404.1574

10  and § 416.974.  Title 20 C.F.R. § 404.1574 provides the SSA determines whether a claimant has

11  engaged in SGA or a UWA by considering earnings and certain other criteria.  20 C.F.R.

12  §§ 404.1574(a)-(b), 416.974(a)-(b); SSR 05-02 para. 4.

13         The first criteria for demonstrating a UWA is the claimant's work must stop or drop below

14  SGA level, for 30 days or more, due to an impairment or the removal of special conditions essential

15  to perform work.  20 C.F.R. § 404.1574(c)(1)-(2), 416.974(c)(1)-(2); SSR 05-02 para. 8.  Second,

16  after the gap of 30 or more days, if the claimant then works for a period of less than three months,

17  then at the end of that period, the person must cease work completely or drop below SGA level, due

18  to their impairment or the removal of special conditions essential to perform work.  20 C.F.R.

19  § 404.1574(c)(1), (3), 416.974(c)(1), (3); SSR 05-02 para. 10.  "Special conditions" include special

20  assistance from employees, irregular hours, special equipment or work suited to an impairment, *et*

21  *seq.*  20 C.F.R. § 404.1573(c); 20 C.F.R. § 416.973(c); SSR 05-02 para.13.

22         The SSA does not oppose Clay's arguments on this issue.  In reviewing the ALJ's findings,

23  the Court notes he did not discuss Clay's earnings.  The Court further notes the facts show Clay

24  stopped working in January 2002 due to an "impairment."  Further, when she returned to work, after

25  being gone more than 30 days, she was given work suited to her impairment.  She only worked,

26  however, for two weeks, because her employer took away her work suited to her impairment,

27  making it impossible for her to work.  Subsequently, she did not work at all.

28         While the ALJ may have reasonably believed Clay could have achieved a SGA, by working

14

1   as a medical-clerical filer, had she found such work, this is not the standard applied by 20 C.F.R.

2   § 404.1574 or § 416.974.  Further, it is unclear whether such a belief would have been reasonable,

3   when Clay had never performed such filing, and did not know whether she had she skills or the

4   physical ability to do it.  Regardless, the Court finds the facts before the ALJ did not provide

5   substantial evidence to find Clay's August 2002 work was SGA.  Thus, the Court holds Clay did not

6   engage in SGA after January 21, 2002.[18]

7   **II.**     **Clay did not oppose the ALJ finding that she did not have any severe impairments**

8            **prior to January 10, 2005.**

9            Although Clay did not oppose the ALJ's findings in the second step of the SSA's five-step

10  analysis, the Court reviews them in detail, as they play a significant and substantial role in

11  supporting and explaining the ALJ's findings in the fourth step of the analysis, which Clay does

12  oppose.

13           **A.     The Legal Standard**

14                At the second step, [the SSA] consider[s] the medical severity of your

15           impairment(s).  If you do not have a severe medically determinable physical or

16           mental impairment that meets the duration requirement in § 404.1509, or a

17           combination of impairments that is severe and meets the duration requirement, [the

18           SSA] will find that you are not disabled.

19  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

20  The duration requirement is twelve continuous months past and/or future, unless the impairment is

21  expected to result in death.  *Id.* §§ 404.1509, 416.909.

22           A severe impairment is "any impairment or combination of impairments which significantly

23

24  [18]     Clay argues the Ninth Circuit held in *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007)
    that the SSA considers a claimant's work period which last for less than nine months, to be part of

25  his or her "trial period," under 20 C.F.R. § 404.1592, and not evidence of SGA.  Mot. at 17:16-19.
    *Lingenfelter* involved a man with well-documented leg and foot pain and degeneration, who only

26  worked nine weeks out of a seven-year period, because he had no money on which to live.  *Id.*
    at 1030-33 Further, the *Lingenfelter* court, in reversing an ALJ for finding the man incredible, held if

27  a person can work nine months for a "trial period" without being considered non-disabled, "then a
    nine week unsuccessful work attempt is surely not a clear and convincing reason for finding that a

28  claimant is not credible regarding the severity of his impairments."  *Id.* at 1039.  *Lingenfelter* has no
    application to Clay's SGA or UWA issue.

limits [a person's] physical or mental ability to do basic work activities ...." *Id.* §§ 404.1520(c), 416.920(c).  "Basic work activities" include, but are not limited to, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" carrying out instructions; responding appropriately to co-workers, *et seq. Id.* §§ 404.1521(b)(1), 416.920(b)(1).

In contrast, an impairment or combination of impairments is not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work ...."  SSR 85-28 para. 12; *see* 20 C.F.R. §§ 404.1521(a), 416.920(a).  Claims of pain or symptoms alone, cannot support finding a severe impairment, which must be supported by a medical diagnosis.  SSR 96-4p (symptoms); SSR 96-3p (pain).  The SSA will not combine two or more unrelated impairments, to determine if a person meets the duration test.  20 C.F.R. § 404.1522(a); § 416.922(a).  If, however, a person has two or more impairments which overlap in time, the SSA will consider them in the aggregate in determining total severity, but only for those periods of time when they overlap.  20 C.F.R. § 404.1522(b); § 416.922(b).[19]

**B.      The ALJ's Findings**

In making his findings, the ALJ proceeded under 20 C.F.R. § 404.1520(c) and § 416.920(c), and made a detailed analysis of Clay's medical records from Kaiser, QTC, Dr. Swartz, and North Oakland.  AR at 23-24.  In particular, the ALJ found Clay had established three severe impairments: degenerative disk disease, degenerative joint disease regarding her knees, and headaches or migraines.  AR at 23 heading 3.  He also found the earliest date she established them was January 10, March 4, and January 11, 2005, respectively.

In regards to Clay's cervical issues, the ALJ found she injured her neck on January 21, 2002. AR at 23 para. 3.  He noted, however, while her pain may have initially been debilitating, it did not keep her from performing modified duty work, limited to lifting or carrying ten pounds, by August

---

[19]      In other words, if each impairment independently is not severe, but together they form a "severe" combination, the time test will be satisfied only if the overlapping period exceeds twelve months.  20 C.F.R. § 404.1522(b); § 416.922(b).

1   2002.  AR at 23 para. 4.  Nor did the pain stop her from pursing a lengthy vocational course, or later

2   pursuing at least twelve job interviews per month, in search of filing work.  *Id.*  And, the ALJ notes,

3   by August 2004, Clay had normal cervical range of motion and no complaints of related pain.[20]  AR

4   at 23 para. 5.  After that time, he noted, she never again complained of cervical pain or a related

5   limited movement.[21]  *Id.*  He thus found her documented period of cervical impairment was eight

6   months.  *Id.*

7   As for Clay's lower back, knees, and migraines, the ALJ noted her August 2004 examination

8   was unremarkable for these issues.  AR at 23 para. 6.  He also noted she did not complain about

9   these symptoms until November 2004 or later.[22]  *Id.*  Turning first to her degenerative disc condition,

10  the ALJ did not find any documented evidence of it, until Dr. Swartz's March 4, 2005 orthopedic

11  examination, which found a tender lumbosacral spine, positive straight leg raising, and sensitivity in

12  the lower legs.  *Id.* at 23 para. 7 - 24 para. 1.  The ALJ also noted, in 2004, Clay's straight leg raise

13  was negative, and she did not exhibit lower extremity sensitivity.  *Id.*  As a result, he did not find

14  this condition documented until March 4, 2005.  *Id.*

15  As for Clay's degenerative knees, the ALJ noted her December 2004 x-ray showed no

16  significant joint disease.  AR at 24 para. 2.  And, at that time, her knees showed no swelling or

17  tenderness, though she had some limited range of motion.  AR at 24 para. 2, 196.[23]  Subsequently, a

18  January 10, 2005 MRI of her knees showed a possible cyst or osteonecrosis.  AR at 24 para. 3.  The

19

20  [20]     The ALJ incorrectly identified Clay's March 22, 2005 examination as performed by Kaiser,
21  when it was actually performed by Bruce Thompson, M.D. of North Oakland.  *See* AR at 23 para. 5,
    254-55.  The error did not affect his analysis.

22  [21]     Actually, because the ALJ failed to review Clay's West Oakland records, *see infra*
23  part IV.C.1.c.v, he failed to note neck-pain complaints on August 1 and 25, and October 2, 2005.
    *See* AR 243, 246, 249.  Clay, however, cannot combine these complaints with her 2002 neck-pain
24  complaints to create a continuous twelve-month impairment period.

25  [22]     In his findings, the ALJ discusses a *February* 2004 lumbar-spinal radiology report.  AR at 23
26  para. 6.  He is apparently basing the date on Dr. Swartz's report, which incorrectly states a
    December 23, 2004 x-ray was performed on February 23, 2004.  *See id.* at 173, 176 para. 8.  The
    error does not affect the ALJ's findings or conclusion.

27  [23]     The ALJ indicates these symptoms were documented in a January 2005 visit to North
28  Oakland, but it appears these were documented in a December 29, 2004 visit.  *See* AR at 24 para. 2
    (citing Ex. "F7" at 10), 196 (which is Ex. "F7" at 10, dated Dec. 29, 2004).

ALJ found this consistent with Dr. Swartz's March 2005 observations leading to a diagnosis of "probable early degenerative disease of both knees[,]" which he found consistent with Clay's alleged statement to Dr. Swartz that the knee pain was "of recent onset." AR at 24 paras. 2-3, 176 para. 1, 178 para. 2. As a whole, the ALJ was willing to give Clay the benefit of the doubt, and though the support was scant, he found her knee degeneration documented as early as January 2005. AR at 24 para. 3.

Turning to her migraines, the ALJ noted Clay had them under control with medication, in December 2004, then reported a two-to-three day flare on January 14, 2005, following which she did not complain about them until a May flare.[24] AR at 24 para. 4. On these facts, the ALJ found a documented severe impairment as of January 11, 2005. *Id.*

**III.** **Clay did not effectively oppose the ALJ's finding she did not have an impairment or combination of impairments which met or medically equaled an Appendix 1 impairment.**

At the third step, the SSA considers the medical severity of a claimant's impairments. 20 C.F.R. §§ 1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant has an impairment that meets or equals one of the listings in 20 C.F.R. Part 220, Appendix 1, and meets the duration requirement, the SSA will find them disabled. *Id.*; *Bustamante*, 262 F.3d at 954. Appendix 1 "describes for each of the major body systems impairments [the SSA] considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Thus, if a clamant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the SSA will find them disabled without considering their age, education, or work experience. *Id.* §§ 1520(d), 416.920(d). An impairment not matching an Appendix 1 listing, may still qualify as severe, if it is "medically

---

[24] The ALJ found Clay did not complain about headaches in her February 28, 2005 visit, but the records clearly show she complained about migraines, though she may not have been suffering from them during her visit. AR at 189. Also, the ALJ found she did not complain about them during her next visit, on March 14, 2005, prompted by a trip to Kaiser due to influenza, but migraines are listed under diagnoses and medical problems sections of the clinic's records for this date. AR at 188. Nonetheless, as the ALJ found this impairment severe as of January 2005, the errors did not affect his analysis.

1    equivalent" to a listing, under criteria established by 20 C.F.R. § 404.1526 or § 416.1526. *Id.*

2    §§ 404.1525(c), 404.1526, 416.925(c), 416.926.

3         In this case, in a short paragraph, the ALJ considered Clay's medical records from QTC,

4    Dr. Swartz, and Dr. St. John to determine her impairments did not meet, exceed, or medically equal

5    any impairment listed in Appendix 1.  AR at 24-25.  Clay's only argument on this issue, was buried

6    in an argument at the end of her Motion, requesting remand for an immediate award of benefits

7    rather than for further proceedings.  Mot. at 17:25-19:3.  In this part, Clay claimed if the ALJ had

8    "properly weighted" her treating physicians' opinions, he would have found her impairments met or

9    equaled listing § 1.04.  Mot. at 18:22-23.  Clay, however, did not explain her reasoning, or to which

10   opinions she was referring.  The Court notes, if Clay were relying on Dr. Thompson's employability

11   examination, her reliance was misplaced, as the ALJ properly rejected this examination.  *See infra*

12   discussion in part IV.C.1.c.iii.  If Clay were alternatively or also relying on other opinions, she failed

13   to provide the Court any analysis, so it could assess and rule on her argument.  Thus, the Court turns

14   its attention to the next step in the ALJ's analysis.

15   **IV.    There was not substantial evidence to support the ALJ's determination of Clay's**

16           **residual functional capacity.**

17        In her Motion, Clay raised four issues, arguing the ALJ failed to properly weigh the health

18   care providers' opinions, properly determine her credibility, recontact her physicians or an outside

19   medical expert, or properly determine her RFC.  For the reasons discussed below, the Court finds the

20   ALJ erred in the fourth step of the SSA's five-step disability analysis, where he ignored Alta Bates'

21   and West Oakland's supervising physicians' opinions, where he failed to make reasonable efforts to

22   determine Clay's credibility, where he failed to provide specific findings stating clear and

23   convincing reasons for finding her partially credible, and where he failed for a number of reasons to

24   properly determine her residual functional capacity ("RFC").  In addition, the Court finds there is

25   insufficient evidence to determine whether or not he had a duty to recontact Dr. Thompson to clarify

26   the bases for his employability opinions.

27        **A.    The Legal Standard**

28        "At the fourth step, [the SSA] considers [its] assessment of your residual functional capacity

and your past relevant work.  If you can still do your past relevant work, [the SSA] will find that you are not disabled." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The RFC determination precedes the past relevant work determination. *Id.* §§ 404.1545(a)(5), 416.945(a)(5).  In this case, the ALJ performed these determinations separately, first determining Clay's RFC.[25]

A clamant's RFC is the most they can still do despite their limitations.  *Id.* §§ 404.1545(a)(1), 416.945(a)(1).  The SSA assesses a claimant's RFC based on all the relevant evidence in their case record. *Id.* §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The determination, however, turns solely on a claimant's medically determinable impairments, whether severe or not. *Id.* §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p paras. 7, 17-18.  It does not turn on a claimant's age, body build, e.g., height or weight, or prior activities.  SSR 96-8p para. 1 ¶ 2, para. 7.  While the claimant bears the burden of producing evidence for determining their RFC, the SSA will make reasonable efforts to develop a complete medical history for the pertinent twelve-month period, by contacting the claimant's providers or arranging for a consultative examination, if necessary.  20 C.F.R. §§ 404.1512(c)-(f), 404.1545(a)(3), 404.912(c)-(f), 416.945(a)(3).  More specific legal standards are provided as needed below.

### B.       The ALJ's Findings

The ALJ, after considering Clay's entire record, concluded she had the RFC to lift and carry up to 20 pounds, but only 10 pounds repetitively, and would miss work approximately once per month due to migraines.  AR at 25 heading 5.  He also found that as she could stoop frequently, but not continuously, this issue posed no additional restriction. *Id.*  In reaching his findings, the ALJ considered Clay's symptoms under 20 C.F.R. § 404.1529 and § 416.929 and SSRs 96-4p and -7p, and considered opinion evidence under 20 C.F.R. § 404.1527 and § 416.927 and SSRs 96-2p, -5p, and -6p.  AR at 25 para. 2.

Under these sections and rulings, the ALJ made five sets of factual findings.  AR at 25-26.  First, he considered all the information discussed in part II.B *infra*, in his second-step determination of Clay's non-severe and severe impairments.  AR at 25 para. 3.  In this regard, he found Clay

---

[25]       The determination of Clay's past relevant work is discussed *infra* in part V.

1  recovered "swiftly" from her 2002 cervical impairment, and thus, neither it nor her 2002 work

2  history supported a lower RFC than he determined.  *Id.*

3        Second, he considered Clay's hearing testimony.  AR at 25 para. 4.  He noted she alleged she

4  suffered migraine flares once or twice a month, but her medical records did not support this.  *Id.*  He

5  also noted she said she could lift only ten pounds, and could walk around the block, before having to

6  stop to rest.  *Id.*  In contrast, however, he noted she also testified she could clean the bathroom and

7  kitchen, sometimes cook, shop, and daily drive to visit friends in Berkeley or her mother in Oakland.

8  *Id.*  He also noted she could care for herself, save for difficulty exiting the tub.  *Id.*  Lastly, he noted

9  she claimed she could clean the bottom of the refrigerator by kneeling.  *Id.*  He thus found Clay only

10 partially credible with regards to her testimony regarding her alleged lifting and walking limitations.

11 *Id.*

12       Third, he considered Dr. Thompson's March 22, 2005 employability examination, prepared

13 so Clay could avoid the GA job search requirement.  AR at 25 para. 5.  The ALJ noted Dr.

14 Thompson declared Clay "unemployable," limited to lifting five pounds, and unable to reach,

15 balance, climb, kneel, do knee bends, or bend at the waist.  AR at 25 para. 5 - 26 para. 1.  The ALJ

16 also noted Dr. Thompson's only comments in his examination form stated Clay had chronic low

17 back pain which limited her range of motion and caused her pain with increased activity.  AR at 26

18 para. 1.  In contrast, the ALJ noted Clay testified to higher lifting limits and to performing tasks

19 Thompson said she could not perform.  *Id.*  The ALJ also noted Dr. Thompson provided no narrative

20 backup to his conclusions, nor were they supported by the indicated symptoms.  *Id.*  Lastly, the ALJ

21 noted the determination of Clay's RFC was not a medical conclusion, but an administrative finding

22 for him to make.  *Id.*  As a result, he gave no weight to Dr. Thompson's examination, in finding

23 Clay's RFC.  *Id.*

24       Fourth, he accorded little weight to QTC's August 21, 2004, examination, performed for the

25 State of California, which found Clay could perform "medium work," as it occurred before Clay's

26 lower back and knee symptoms had become severe impairments.  AR at 26 para. 2.

27       Fifth, the ALJ considered neurosurgeon Dr. St. John's opinions regarding Clay's RFC, save

28 to note her headaches and migraines were not at issue during this September 10, 2002 exam.  AR

at 26 para. 3.  Thus, to incorporate these into her RFC, the ALJ noted her testified frequency of one migraine or two flares per month, should have generated at least five migraines or ten flares, while she treated at North Oakland.  *Id.*  These records, however, only showed two flares.  *Id.*  Despite these issues with her credibility, he also considered she might not have reported every incident to clinic personnel.  *Id.*  Thus, based on her medically determinable impairments, he found her alleged symptoms were credible, but less so her testimony regarding their intensity, duration, or limiting effects.  *Id.*

### C.      Analysis of Clay's Arguments

#### 1.      The ALJ properly weighted all of the medical sources' opinions, except for Alta Bates and West Oakland, which he improperly ignored.

Clay first argues Kaiser, Dr. Hebrard, Dr. Thompson at North Oakland, Dr. Swartz, Alta Bates, and West Oakland were Clay's treating or examining physicians, and the ALJ improperly rejected their opinions, in favor of Dr. St. John's or the ALJ's own lay opinion, without providing specific, legitimate reasons supported by substantial evidence.  Mot. at 12-19.  The SSA essentially argues the ALJ provided several specific reasons for reaching his findings all of which were supported by substantial evidence and the law.  Opp'n at 6:2-3.

##### a.      The treating versus non-treating sources.

Title 20 C.F.R. § 404.1527 states, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §§ 404.1527(b), 416.927(b).  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources ...."  *Id.* §§ 404.1527(a)(2), 416.927(a)(2).  An "[a]cceptable medical source ... includes treating sources, nontreating sources, and nonexamining sources."  *Id.* §§ 404.1502 para. 1, 416.902 para. 1; *see Lester v. Chater*, 81 F.3d 821, 830, 830 n.7 (9th Cir. 1995).

A "treating source" means a physician, psychologist, or other acceptable medical source who provides or has provided a claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with them.  20 C.F.R. §§ 404.1502 para. 7, 416.902 para. 7.  An "ongoing relationship" has "a frequency consistent with accepted medical practice for the type of

1    treatment and/or evaluation required for [their] medical condition(s)." *Id.*  A physician who

2    ///

3    supervises a team of persons who together have an "ongoing relationship" with a claimant, qualifies

4    as a "treating physician." *Benton v. Barnhart*, 331 F.3d 1030, 1037-39 (9th Cir. 2003).

5          In contrast, a "nontreating source" means a physician, psychologist, or other acceptable

6    medical source who has examined a claimant, but does not have nor ever had an ongoing treatment

7    relationship with them.  20 C.F.R. §§ 404.1502 para. 6, 416.902 para. 6.  This includes any

8    acceptable medical source with whom the claimant's only relationship is or was not based on their

9    need for treatment or evaluation but only for obtaining a report to support a disability claim.  *Id.*

10   A "nonexamining source" means a physician, psychologist, or other acceptable medical source who

11   has not examined a claimant, but who provides a medical or other opinion in their case.  *Id.* para. 5.

12         Under 20 C.F.R. § 404.1502 and § 416.902, Clay's health care providers, fall into the

13   following categories.  Clay had fourteen visits at Kaiser from January 24 through June 19, 2002.

14   Although the physician who signed off on her visits is difficult to determine, and appears to have

15   changed over time, a team of Kaiser providers had an ongoing relationship with Clay.  Thus, given

16   Kaiser was the HMO discussed in *Benton*, establishing that supervising physicians qualify as

17   treating sources where their team has an ongoing relationship with a patient, Kaiser's supervising

18   physicians qualify as treating sources.  For the same reasons, North Oakland's physicians who

19   supervised Clay's treatment over 12 visits from November 3, 2004 through May 23, 2005, were

20   treating sources.  Likewise, the physicians who supervised Clay's treatment over seven visits to

21   West Oakland were treating sources.

22         In contrast, Dr. Hebrard only saw Clay twice, and Dr. St. John, QTC, Dr. Swartz, and Alta

23   Bates only saw her once.  Thus, these physicians and the entities' physicians were examining

24   sources.

25                      **b.       None of the treating sources were controlling.**

26         Regardless of its source, the SSA evaluates every medical opinion received.  *Id.*

27   §§ 404.1527(d), 416.927(d).  If a *treating* source opinion meets certain criteria, the SSA will give it

28   controlling weight.  *Id.* §§ 404.1527(d)(2), 416.927(d)(2).  Certain decisions, however, such as

determining a claimant's RFC, are reserved to the SSA only, and may not be controlled by any acceptable medical source. *Id.* §§ 404.1527(e)(2), 416.927(e)(2); SSR 96-5p paras. 6, 8; *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). Thus, even though Clay's supervising physicians at Kaiser, North Oakland, and West Oakland were treating sources, their opinions were not controlling on the ALJ's determination of Clay's RFC.

### c.      The weighting process.

For treating sources which are not controlling, or for other acceptable medical sources, the SSA weighs the following six factors:  (1) Examining Relationship:  The SSA generally accords more weight to an examining source, than a non-examining source.  20 C.F.R.  §§ 404.1527(d)(1), 416.927(d)(1). (2) Treating Relationship:  The SSA generally accords more weight to an treating source, than a non-treating source.  *Id.* §§ 404.1527(d)(2), 416.927(d)(2).  In weighing such a source, the SSA will consider the length, frequency, and nature of treatment, including whether any testing was done.  *Id.*  (3) Supportability:  The SSA generally accords more weight to a medical source who presents greater relevant evidence to support their opinion, particularly medical signs, laboratory findings, explanations, or reviews of other source's records and opinions.  *Id.* §§ 404.1527(d)(3), 416.927(d)(3).  (4) Consistency:  The SSA generally accords more weight to an opinion consistent with the record as a whole.  *Id.* §§ 404.1527(d)(4), 416.927(d)(4).  (5) Specialization:  The SSA generally accords more weight to a specialist's opinion in their area, than a non-specialist's opinion on the same topic.  *Id.* §§ 404.1527(d)(5), 416.927(d)(5).  (6) The SSA will also consider other relevant factors, such as how well the source understands how the SSA's disability programs operate.  *Id.* §§ 404.1527(d)(6), 416.927(d)(6).  *See also* SSR 96-5p paras. 7, 9-10 (In determining a reserved issue, the SSA must never ignore medical opinions, but must apply § 404.1527(d) and § 416.927(d) factors to them.).

As the Ninth Circuit has held:

> As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.  At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  We have also held that "clear and

1    convincing" reasons are required to reject the treating doctor's ultimate conclusions.

2    Even if the treating doctor's opinion is contradicted by another doctor, the

3    Commissioner may not reject this opinion without providing "specific and legitimate

4    reasons" supported by substantial evidence in the record for so doing.

5    *Benton*, 331 F.3d at 1037-39 (quoting *Lester*, 81 F.3d at 830 (citations omitted)).

6         In this case, as discussed below, the ALJ properly weighted all of the medical sources'

7    opinions, except for Alta Bates and West Oakland, which he completely ignored.  Clay's primary

8    argument on the weighting issue is the ALJ should have given Dr. Thompson's employability

9    examination more weight than Dr. St. John's examination, because the former was a treating source,

10   while the latter was not.

11        To help explain why Clay is incorrect, the Court first restates her physicians' lift

12   conclusions, noting the ALJ concluded she could lift at most 20 pounds, and only 10 pounds

13   repetitively.  In June 2002, Kaiser treating physicians indicated Clay could carry no more than

14   10 pounds, as did Dr. Hebrard, an examining physician, in July and August 2002.  In September

15   2002, Dr. St. John, an examining physician, indicated she could carry 20 pounds, but only 10 pounds

16   repetitively.  Two years later, in August 2004, in a California disability examination, QTC said Clay

17   could lift 50 pounds occasionally and 25 pounds frequently.  Then, in March 2005, Dr. Thompson, a

18   treating physician, in her employability examination, indicated she could only lift 5 pounds, and

19   could not climb, bend, reach, kneel, or balance.  The Court now examines how the ALJ weighted Dr.

20   St. John's opinion against those of Clay's other physicians.

21                                    **i.    QTC**

22        In determining Clay's RFC, the ALJ disregarded QTC's "high" analysis, as preceding the

23   March 2005 onset or diagnosis of her severe back and knee impairments, a decision Clay does not

24   challenge.[26]  The Court notes the ALJ's specific and legitimate reason for rejecting QTC's

25   physicians' opinion, inconsistent with those of Clay's other physicians, is supported by substantial

26   evidence.

27   _____

28   [26]    In fact, Clay incorrectly claims Dr. St. John has the most "optimistic" RFC, Docket No. 18
     at 5:14-18 (Pl.'s Reply), but clearly QTC's outlier RFC deserves this award.

                                          25

1    ///

2    ///

3                               **ii.    Kaiser and Dr. Hebrard**

4           Likewise, substantial evidence supports the ALJ accepting Dr. St. John's opinion, over those

5    of Kaiser's supervising physicians and Dr. Hebrard.  The latter, who works in physical

6    rehabilitation, sent Clay to Dr. St. John, a neurosurgeon, to bring his speciality to bear on her spinal

7    issues.  Further, although he only examined her once, Dr. St. John reviewed her Kaiser records, her

8    MRI, interviewed her, performed specialized examinations, and explained all this in a detailed

9    narrative supporting his diagnoses.  Although the ALJ did not expressly state these specific and

10   legitimate reasons in the record, his detailed review of Dr. St. John's records, and his use of them in

11   his opinion, permits the Court to reasonably infer such specific and legitimate reasons in support of

12   his findings.  *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (reviewing court may

13   draw legitimate inferences where not expressly stated by ALJ).  Thus, the Court finds substantial

14   evidence supported the ALJ weighting Dr. St. John's opinion over those of Dr. Hebrard and Kaiser's

15   supervising physicians.[27]

16                              **iii.    Dr. Thompson**

17          Turning to Dr. Thompson, the ALJ noted Clay sought an employability examination so she

18   could avoid the GA job-search requirement.  He also correctly noted there was no clinical backup,

19   testing, or narrative explanation attached to Alameda County's two-page check-the-box form.  "[A]n

20   ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported ... by

21   objective medical findings ...."  *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir.

22   2004) (internal citation omitted).  He further correctly noted the boxes Dr. Thompson checked,

23   indicating Clay could not bend, reach, kneel, *et seq.* were completely contradicted by Clay's own

24   testimony regarding her limitations and regularly daily activities.  *See id.* (ALJ may discredit a

25   treating opinion unsupported by the record as a whole).  And, he correctly noted, Dr. Thompson's

26   _____

27   [27]     The Court is not applying the *Benton* standard to a comparison between Dr. St. John and
     Dr. Hebrard, both examining sources.  The Court is noting that for the same reasons the ALJ favored
28   Dr. St. John's opinion over Dr. Hebrard's, he reasonably favored it over those opinions provided by
     Kaiser's supervising physicians.

opinion or checked boxes were not controlling on the RFC issue, which fell to him, as the ALJ, to

determine.   *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); SSR 96-5p paras. 6, 8; *Vertigan*, 260

F.3d at 1049.  As such, the ALJ provided specific and legitimate reasons, supported by substantial

evidence, for favoring Dr. St. John's examining opinion over Dr. Thompson's treating opinion.

In opposition, Clay argues the ALJ should have given Dr. Thompson's examination more

weight, because at that time, Dr. Thompson was her "treating" physician at North Oakland, where

she received regular treatment.  The Court disagrees with Clay's conclusion for three reasons.

First, under *Benton*, it is unclear Dr. Thompson was Clay's treating physician.  Clay's North

Oakland medical records are attached to the Administrative Record as Exhibit "F7."  *See* AR

at 186-99.  In them, Dr. Thompson's name only appears on pages 192, 194, and 197, in address

blocks for lab reports, or typed by a radiologist on a film report, ordered by North Oakland.  Neither

his name nor his initials appear on any other North Oakland records.[28]  Thus, there is no evidence to

indicate he had personally treated Clay prior to the employability examination, nor met with any

staff or used her treatment records to complete the check-the-box form.  As *Benton*, 331 F.3d  at

1037-39, makes clear, a physician must be *part* of a treating team, to have a treating opinion.  It is

insufficient to merely work in the same office, or be a name used to order tests.

Second, even if Dr. Thompson were Clay's treating physician at the time of the examination,

the boxes checked are not supported by any information in her North Oakland records.  That is the

form does not mention her records, nor do her records mention the form.  Also, there are no

narratives, lab tests, or clinical data in her medical records which would support the boxes checked

in the form.  Also, the form itself is not part of her North Oakland records, but is attached to the

Administrative Record as a separate Exhibit "F15."  *See* AR at 254-55.  Thus, under *Batson*, the ALJ

was within his right to devalue Dr. Thompson's treating opinion.

Third and last, the boxes checked in the form, indicating Clay can essentially do nothing, are

contradicted by every other medical opinion in the Administrative Record.  Thus again, under

---

[28]      In fact, the "Supervising M.D." box is always blank, in these records, AR at 187-91, 193, 196, 198-99, except for December 29, 2004, when the clinician put his or her initials in the Clinician box and the Supervising M.D. box., *id.* at 195.

1    ///

2    ///

3    *Batson*, the ALJ was within his right to favor Dr. St. John's examining opinion over Dr. Thompson's

4    treating opinion.[29]

5                                    **iv.      Dr. Swartz**

6            Clay argues the ALJ improperly weighted Dr. St. John's September 2002 opinion over

7    Dr. Swartz's March 2005 opinion.  Mot. at 12-19.  The Court first notes both doctors only examined

8    Clay once.  Thus, neither is prima facie entitled to superior weight.  Second, the Court notes the ALJ

9    analyzed both reports in detail, using Dr. Swartz's to find Clay disabled in step two, and using

10   Dr. St. John's to validate his RFC in step four.

11           Turning to Clay's argument, it appears to run as follows:  In September 2002, Dr. St. John

12   found she could lift at most 20 pounds, and repetitively lift 10 pounds.  Then, her condition

13   worsened, such that the ALJ found her disabled based on Dr. Swartz's March 2005 examination.  As

14   a result, she concluded, her lift capacity should be lower in 2005, than in 2002.  But, she notes, the

15   ALJ found her RFC matches Dr. St. John's 2002 assessment.

16           While Clay's argument is logical, Dr. Swartz did not provide a lift capacity, in his report.

17   Further, based on the Administrative Record before the Court, it is difficult to quantitatively

18   establish how much worse Clay was in 2005 than in 2002.  Thus, as discussed in part IV.b *infra*, the

19   ALJ's error was failing to obtain more information on the lift capacity issue, not necessarily

20   improperly favoring one opinion over another.  Whether the ALJ had favored Dr. St. John over

21   Dr. Swartz, or vice-versa, without a lift assessment in the latter's report, the Court would be hard

22   pressed to find substantial evidence in support of the ALJ's reasoning, given the Administrative

23   Record before the Court.

24                               **v.      Alta Bates and West Oakland**

25           In contrast to the foregoing physicians, the ALJ failed to mention at all the opinions provided

26

27   _____

28   [29]      The Court notes, however, if Dr. Thompson qualifies as a treating physician, then for
     purposes of determining Clay's RFC, the ALJ should have recontacted him to clarify the bases for
     his opinions expressed in the employability examination.  *See infra* part IV.C.3.

from May through December 2005, by Alta Bates' examining physicians or West Oakland's treating physicians.  These were Clay's most recent opinions presented at her March 2006 hearing.  In determining a claimant's RFC, an ALJ is required to consider all relevant evidence, and may not ignore any treating or examining opinions.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  Here, not only did the ALJ without explanation, ignore Clay's most recent medical opinions, but these records indicated she was still dealing with old impairments like neck and back pain, and new ongoing impairments, specifically, depression, mood issues, and hemorrhoids.  In determining an RFC, an ALJ *must* consider *all* impairments, severe or not.  *Id.* §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p paras. 7, 17-18.  Here, the ALJ did not do this.

At the same time, however, in the fourth step of the disability analysis, Clay has the burden to present her evidence to the ALJ.  *Id.* §§ 404.1512(c), 404.1545(a)(3), 404.912(c), 416.945(a)(3).  There is no indication, however, she ever claimed to the ALJ these conditions impaired her ability to work.  Because the Court is remanding this matter for a redetermination of the fourth step of the analysis, the Court need not, and will not, resolve this issue here.  On remand, Clay may present these impairments more directly, if she wishes, and the ALJ may properly consider the Alta Bates and West Oakland records in determining her RFC.

**2.     The ALJ failed to make reasonable efforts to determine Clay's credibility, and he failed to provide specific findings stating clear and convincing reasons for his determinations.**

Clay's second argument is the ALJ concluded she was partially credible, based only on her testimony of her activities, instead of considering the whole case record, and failed to state specific clear and convincing reasons for doing so.  Mot. at 14:1-3.

**a.     Legal Standard**

According to the SSA, "[a] symptom is an individual's own description of his or her physical or mental impairment(s)."  SSR 96-7p para. 4.  To admit symptom testimony, an ALJ uses a two-step process.  20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p para. 4; *Batson*, 359 F.3d at 1196.  First the claimant must identify one or more medically determinable impairments through objective medical evidence which could reasonably be expected to produce the alleged symptom.  20 C.F.R.

29

1   §§ 404.1529(a), 416.929(a); SSR 96-7p para. 5 sub-para. 1; *Batson*, 359 F.3d at 1196.

2   ///

3           Second, once an underlying physical or mental impairment(s) that could

4       reasonably be expected to produce the individual's pain or other symptoms has been

5       shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of

6       the individual's symptoms to determine the extent to which the symptoms limit the

7       individual's ability to do basic work activities.  For this purpose, whenever the

8       individual's statements about the intensity, persistence, or functionally limiting

9       effects of pain or other symptoms are not substantiated by objective medical

10      evidence, the adjudicator must make a finding on the credibility of the individual's

11      statements based on a consideration of the entire case record.

12   SSR 96-7p para 5 sub-para. 2; *see* 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c); *see Batson*, 359

13   F.3d at 1196.

14          "The entire case record" includes medical opinions, the claimant's statements, *et seq*.  SSR

15   96-7p para 5. sub-para. 2.  "When additional information is needed to assess the credibility of the

16   individual's statements about symptoms and their effects, the adjudicator must make every

17   reasonable effort to obtain available information that could shed light on the credibility of the

18   individual's statements."  SSR 96-7p para. 6.  Additional information an ALJ may consider includes

19   a claimant's daily activities; the location, duration, frequency, and intensity of their symptoms;

20   precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any

21   medications; treatment, other than medication; measures to relieve symptoms, e.g., lying flat on

22   one's back; *et seq*.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p para. 6.

23          If an ALJ determines a claimant's statements are not credible, he or she must provide

24   "specific reasons for the finding on credibility, supported by the evidence in the case record, and

25   must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

26   weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR

27   96-7p para. 2 ¶ 5.  The Ninth Circuit requires "specific findings stating clear and convincing

28   reasons."  *Batson*, 359 F.3d at 1196 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.1996)).

1   ///

2   ///

3                           **b.      Analysis**

4          The ALJ made two credibility determinations regarding Clay's testimony.  First, he found

5   her claim of suffering one to two migraine flares a month unsupported by her medical records.

6   While it is true her records did not specifically indicate her migraine frequency, in determining a

7   claimant's credibility, an ALJ *must* consider the *entire record*, and may not reject a claimant's

8   testimony based *solely* on medical evidence.  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

9          Further, SSR 96-7p cautions there may be many reasons a claimant may not always seek

10  treatment for a given symptom, such as cost, medical advice against the need to, the ability to treat

11  on one's own, *et seq*.  SSR 96-7p para. 25.  Clay testified she treated her flares by taking Fioricet

12  and laying down for the day.  AR at 277-78.  Thus, to the extent she had her medication when a flare

13  occurred, she would not need to see a provider.  In fact, the ALJ conceded Clay may not have

14  reported every incident to her providers.[30]  The point here, however, is if the ALJ had questions

15  about this issue, he should have asked Clay about it in her hearing.  This is because he had a duty to

16  "make every reasonable effort to obtain available information that could shed light on the credibility

17  of [Clay's] statements."  He did not do this, however.  Nor did he provide clear and convincing

18  specific reasons, drawn from the entire record, for rejecting her given flare frequency.

19         For his second credibility determination, the ALJ found Clay's allegations she could only lift

20  ten pounds and walk around the block, before stopping to rest, inconsistent with her testimony

21  regarding her activities.  The Court notes that Clay testified she cleaned the bathroom and the

22  kitchen, sometimes cooked, shopped, and drove daily to visit friends in Berkeley or sometimes to

23  her mother's in Oakland.  She also said she could care for herself, save for difficulty exiting the tub.

24  And, she said she could sit on a chair or kneel down to clean the bottom of the refrigerator.[31]

25  ————————————————

26  [30]     In this regard, the Court notes the ALJ may have missed some reports she made to her
    physicians.  *See* note 24 *supra*.

27  [31]     The Court notes Clay's activity testimony has remained consistent since she completed her
28  Pain Questionnaire in June 2004, saw Dr. Swartz in March 2005, and testified at her hearing in
    March 2006.

The ALJ did not explain how Clay's activity testimony was inconsistent with her lifting or walking testimony. First, the ALJ provided no analysis as to how lifting ten pounds related to any of her activities. Clay even testified her daughter did the heavy lifting at the grocery store, and moved the wet clothes from the washer to the dryer.

As for her walking limitation, the ALJ apparently felt it conflicted with Clay's level of activity. He never asked her, however, how often she cleaned, how big the task was, or how long it took her. In fact, she testified she had to rest while doing her chores, and rarely swept, mopped, or vacuumed. Further, while driving is not absolute proof she has difficulty walking, it is consistent with such having such difficulty. Nor does it appear she ever drove very far, nor did much more than watch television when she arrived at her friends' homes. Lastly, her need to use a chair or to kneel to clean the bottom of the refrigerator, is consistent with her walking testimony, and with her knee-related disabilities. As Clay noted, she need not be "utterly incapacitated to be disabled," citing to *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Mot. at 14:23-25.

In opposition, the SSA essentially conceded the ALJ failed to provide specific clear and convincing statements regarding Clay's credibility, but under *Magallanes v. Bowen*, urged the Court to draw inferences on the ALJ's behalf. Opp'n at 8:22-27. First, the SSA argued Clay was not credible because when she claimed she was disabled in 2002, she was doing modified work, took vocational training, and looked for 12 jobs per month. *Id.* at 9:1-11. The SSA failed to explain how any of this made Clay incredible. The Court notes, the ALJ found during this period Clay was impaired for at least 8 months, but not 12, and hence was not "severely" impaired or disabled. A mistake of law does not make Clay incredible.

The SSA further argued that evidence Clay was incredible was seen in that she did modified work in 2002, and admitted she could do filing work, back in 2003, but at the same time, she claimed she was disabled during these periods and unable to do *any* work. *Id.* at 9:23-10:3. The Court already held, however, Clay's August 2002 labor was a UWA and that it was improperly speculative for the ALJ to consider Clay's possible file clerk career as suggesting otherwise. *See supra* part I.

The SSA then argued Clay's was incredible, implying she overstated her medical conditions,

as her medical records allegedly only showed "mild" degenerative changes in her spine and knees. Opp'n at 10:11-13.  As the SSA conceded, however, medical records by themselves are insufficient to show Clay incredible.  *Id.* at 10:13-14.  The SSA then argued Clay's daily activities showed her incredible.  *Id.* at 10:19-20.  The Court, however, already found otherwise.  The SSA's final argument was the ALJ did not find Clay entirely incredible, and did give her light work, even though in the SSA's opinion, she could do medium work.  *Id.* at 10:2-6.  The Court notes, however, as the ALJ did not properly determine Clay's past relevant work, *see infra* part V, the SSA's final argument is unavailing.

Thus, having considered the Administrative Record, and the parties' arguments, the Court finds the ALJ erred in determining Clay's credibility for two reasons.  First, he violated the legal standard by failing to make reasonable efforts to determine Clay's credibility.  And second, the Court finds a lack of substantial evidence, as he failed to provide specific findings stating clear and convincing reasons for his determinations.

### 3.     If Dr. Thompson were Clay's treating physician, then the ALJ failed to recontact him.

For her third argument, Clay argues the ALJ erred by not contacting her physicians, citing to *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996), Mot. at 13:4-12, or by failing to bring in an outside medical expert, under SSR 96-6p, Mot. at 16:24-17:8.  The SSA argues the only "recontact" law applicable to Clay's matter is 20 C.F.R. § 404.1527(c) and § 416.927(c), which only apply when an ALJ has insufficient information to determine disability, which was not the case here.  Opp'n at 7:17-21, 12:27-13:13.

Turning first to Clay's argument regarding *Smolen*, in that matter, the ALJ was faced with opinions from two treating physicians, which were in agreement.  *Smolen*, 80 F.3d at 1285, 1288. The opinions had been prepared in response to written questions and information provided by the claimant's attorney.  *Id.* at 1286.  One of these physicians did not testify at the claimant's hearing. *Id.* at 1288.  The ALJ, rejected the non-testifying physician's written opinions, but failed to provide clear and convincing reasons why.  *Id.*  Instead, he indicated he rejected them because he "did not know the basis for [the physician's] opinions and thought that they might have been based on

33

1    unwarranted assumptions." *Id.*

2    ///

3         In reversing, the court held if the ALJ thought he needed to know the basis of the physician's

4    opinions, he should have subpoenaed the physician or submitted further questions to him, *id.* (citing

5    42 U.S.C. § 405(d); 20 C.F.R. §§ 404.950(d), 404.1527(c)(3)), or continued the hearing to augment

6    the record, *Smolen*, 80 F.3d at 1288 (citing 20 C.F.R. § 404.944)).  Turning to this case, the SSA

7    correctly notes *Smolen* is inapplicable here, as the ALJ never indicated he needed to know the basis

8    for any of Clay's physicians' opinions.  While the ALJ correctly noted Dr. Thompson failed to

9    provide any basis for why he checked the boxes he did, on Clay's employability examination, the

10   ALJ never expressed any curiosity as to what Dr. Thompson's reasons might have been.

11        Switching now to SSR 96-6p, the purpose of this SSR is "[t]o clarify Social Security

12   Administration policy regarding the consideration of findings of fact by State agency medical and

13   psychological consultants and other program physicians and psychologists ...."  SSR 96-6p para. 1.

14   The SSR explains that an ALJ should generally treat these persons' opinions as issued by a non-

15   examining physician or psychologist.  *Id.* para. 4.  Clay fails to explain how this SSR relates to her

16   matter, which involved no such non-examining sources.  Thus, the Court finds SSR 96-6p is

17   inapplicable to her matter.

18        While Clay failed to directly identify the governing "recontact" law for this matter, the SSA

19   did likewise, when it argued this matter was governed by 20 C.F.R. § 404.1527(c) & § 416.927(c).

20   As a result, the SSA argued the ALJ only had to recontact Clay's physicians if he were unable to

21   decide on the evidence whether or not she was disabled.  See 20 C.F.R.

22   §§ 404.1527(c)(3), 416.927(c)(3).  As he did make this determination, the SSA argued he did not

23   have to recontact Clay's physicians.  While the SSA correctly interpreted these regulations, the

24   Court notes they address a determination of a claimant's *disability*, but not their *RFC*.

25        As the Ninth Circuit has held, "[i]n Social Security cases the ALJ has a special duty to fully

26   and fairly develop the record and to assure that the claimant's interests are considered."  *Smolen*, 80

27   F.3d at 1288 (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983)).  "This duty exists even

28   when the claimant is represented by counsel."  *Id.*  SSR 96-8p, which states the SSA's policy

34

1   regarding determining RFCs, states an ALJ "*must* ... make every reasonable effort to ensure that the

2   file contains sufficient evidence to assess RFC."  SSR 96-8p para. 17 (emphasis added).  Likewise,

3   SSR 96-5p, which states the SSA's policies for determining "issues reserved to the Commissioner,"

4   including a claimant's RFC, expressly states:

5           Because treating source evidence (including opinion evidence) is important, if

6       the evidence does not support a treating source's opinion on any issue reserved to the

7       Commissioner and the adjudicator cannot ascertain the basis of the opinion from the

8       case record, the adjudicator *must* make "every reasonable effort" to recontact the

9       source for clarification of the reasons for the opinion.

10  SSR 96-5p para. 25 (emphasis added).

11          In turn, 20 C.F.R. § 404.1512(d)(1) and § 416.912(d)(1) state:

12          "Every reasonable effort" means that [the SSA] will make an initial request

13      for evidence from your medical source and, at any time between 10 and 20 calendar

14      days after the initial request, if the evidence has not been received, [the SSA] will

15      make one followup request to obtain the medical evidence necessary to make a

16      determination.  The medical source will have a minimum of 10 calendar days from

17      the date of [the] followup request to reply, unless [the SSA's] experience with that

18      source indicates that a longer period is advisable in a particular case.

19  20 C.F.R. §§ 404.1512(d)(1), 416.912(d)(1).

20  Further, 20 C.F.R. § 404.1512(f) and § 416.912(f) state, "[i]f the information [the SSA] need[s] is

21  not readily available from the records of your medical treatment source, or [the SSA is] unable to

22  seek clarification from your medical source, [the SSA] will ask you to attend one or more

23  consultative examinations at [the SSA's] expense."  *Id.* §§ 404.1512(f), 416.912(f).

24          The only treating physician, whose opinion the ALJ found unsupported by the evidence, was

25  Dr. Thompson's, as expressed in the checked boxes of Alameda County's employability

26  examination form.  As the Court noted, it is unclear whether Dr. Thompson has a sufficient

27  connection to Clay to qualify as a treating physician.  *See supra* part IV.C.1.c.iii.  Assuming he was,

28  however, the parties

35

have not indicated whether the ALJ recontacted him to seek clarification regarding his employability

opinions.  The parties, however, may address these issues on remand.[32]

### 4.       The ALJ improperly determined Clay's RFC.

Neither party adequately addresses this issue, but as explained below, the ALJ applied the

wrong legal standards in determining Clay's RFC, and there is not substantial evidence to support

the RFC he determined for her.

#### a.       Legal Standard

When a claimant requests a hearing before an ALJ to review a determination of their RFC,

the ALJ determines it, rather than deferring to an earlier determination below.  20 C.F.R.

§§ 404.1546(c), 416.946(c).  The ALJ determines a claimant's RFC by considering their ability to

meet certain physical, mental, sensory, or other requirements of work.  *Id.* §§ 404.1545(a)(4),

416.945(a)(4).  The goal is to assess the claimant's ability to do sustained work-related activities, on

a regular and continuing basis, for eight hours a day, for five days a week, or an equivalent work

schedule.  SSR 96-8p para. 1 ¶ 1, para. 6.  Thus, the ALJ considers any inability to sit, stand, walk,

lift, carry, push, pull,[33] or perform other physical functions, including manipulative or postural

functions like reaching, handling, stooping, or crouching.[34]  *Id.* §§ 404.1545(b), 416.945(b).  The

SSA also considers any inability to understand, remember, follow instructions, or respond

appropriately to supervision, co-workers, or work pressures.[35]  *Id.* §§ 404.1545(c), 416.945(c).  And,

---

[32]       The Court notes while *Smolen* might seems similar to SSR 96-5p, *Smolen* held the ALJ must recontact a physician, or take other steps, only if the ALJ *wanted* to know the basis of his or her opinion.  In contrast, SSR 96-5p provides if certain deficiencies exist in the administrative record, the ALJ *must* recontact a claimant's physician, regardless of their curiosity level.
        The Court also notes it may seem questionable to recontact a physician whose opinion deviates substantially from every other physician and contradicts Clay's own testimony.  The benefit of recontact, however, is to *clarify* this deviation.  In the alternative, if recontact is unsuccessful, then the benefit would be to conduct a consultative examination, which ideally would provide a current value for Clay's lifting capacity, and other measurable capacities, e.g., sitting, standing, *et seq*.

[33]       These are defined as "strength" demands.  SSR 96-8p para. 20.

[34]       These are defined as "non-strength" or "non-physical-strength" demands.  SSR 96-8p para. 22.

[35]       These are defined as "mental" demands.  SSR 96-8p ¶ 6, para. 22.

36

the SSA considers any environmental impairments, e.g., visual or auditory, skin disorders, epilepsy, which affect a person's ability to function within certain types of environments, such as those with extreme temperatures,[36] *et seq.* *Id.* §§ 404.1545(d), 416.945(d).[37]   The ALJ *must* consider each strength demand separately, and consider how each identified *medical* impairment or symptom, like pain, causes a *functional* limitation or impairment in a claimant's "exertional capacity."[38]   SSR 96-8p para. 1 ¶ 6, paras. 10, 20-21.  This is true, even if the final RFC assessment will combine activities, such as considering a claimant's exertional capacity to walk/stand, lift/carry, or push/pull. *Id.* para. 20.  The ALJ *must* do the same analysis for each non-strength and mental demand, and for any applicable environmental demands, to determine if a claimant has any "non-exertional" limitations or impairments.  *Id.* para. 1 ¶ 6, paras. 10, 22-23.  The ALJ must keep in mind some symptoms, like pain, may affect both strength demands and other demands, such as an manipulation or concentration.  *Id.* para. 24.

Lastly:

> The RFC assessment must include a narrative discussion describing how the

_____

[36]      These are defined as "environmental" demands.  SSR 96-8p ¶ 6, para. 22.

[37]      Although there is a tendency among the parties to use the terms "sedentary," "light," or "medium" work in discussing Clay's RFC as determined by the ALJ in the first part of the fourth step of the SSA's five-step analysis, *see*, *e.g.*, Mot. at 15:9-16:10, such terminology is inappropriate during this part of the step.
> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945.  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p para. 1 ¶ 4.
> At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.

SSR 96-8p, para. 10.
      The Court notes the parties might have avoided this error, had they tailored their arguments to the SSA's five-step process, and indicated which step of the process they were addressing with their arguments.  Instead, the parties merely advanced arguments, leaving it to the Court to determine to which step of the process they were directed.  Nonetheless, the Court notes the parties' papers were otherwise reasonably well drafted.

[38]      For example, "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours[.]"  SSR 96-8p para. 20.

37

1    evidence supports each conclusion, citing specific medical facts (e.g., laboratory

2    findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing

3    RFC, the adjudicator must discuss the individual's ability to perform sustained work

4    activities in an ordinary work setting on a regular and continuing basis ... and

5    describe the maximum amount of each work-related activity the individual can

6    perform based on the evidence available in the case record.  The adjudicator must

7    also explain how any material inconsistencies or ambiguities in the evidence in the

8    case record were considered and resolved.

9    *Id.* para. 24.

10   This includes discussing all symptoms, such as pain, any supporting evidence for them, resolving

11   any inconsistencies therein, and logically explaining how the symptoms affect the claimant's ability

12   to work.  *Id.* paras. 25-26.

13                                        **b.        Analysis**

14          The ALJ concluded Clay had the RFC to lift 20 pounds at most, but 10 pounds repetitively,

15   to miss one day a month due to migraines or migraine flares, and to stoop frequently but not

16   continuously.  As an initial matter the Court considers whether the ALJ properly considered the

17   seven strength demands, in determining Clay's RFC.  Turning first to sitting and standing, Clay

18   indicated in her June 8, 2004 Pain Questionnaire that she could sit for 15 to 30 minutes[39] at time and

19   stand for 15 to 20 minutes at a time.  These medical limitations are consistent with lower-back or

20   knee impairments.  The ALJ, however, failed to address them in his narrative or explain what

21   functional limitations they caused.[40]  He also failed to explain how the evidence in Clay's case file

22   supported them or not.  Thus, for failing to consider the strength demands of sitting and standing, the

23   Court reverses the ALJ's RFC determination, for failure to apply the correct legal standard.

24          With regards to walking, Clay has consistently maintained, including at her hearing, that she

25   _____

26   [39]      She testified to 30 minutes at a time, at her hearing.

27   [40]      In propounding hypotheticals to the vocational expert at Clay's hearing, however, the ALJ
     assumed Clay could sit and stand for six out of eight hours per day.  AR at 292-96.  The ALJ did not

28   explain how he determined these functional limitations, nor does their use at Clay's hearing
     substitute for the narrative analysis required by SSR 96-8p.

can walk around the block, but must then stop to rest.  She has also indicated difficulty with stairs, due to the exertion of climbing, and concerns with her right knee failing on descent.[41]  Unlike sitting and standing, the ALJ did analyze Clay's medical limitations on walking, in his narrative, but appeared to dismiss them due to alleged issues with Clay's credibility.  As the Court failed to find the ALJ's credibility determination supported by law or substantial evidence, *see* part IV.C.2.b *supra*, the Court reverses the ALJ's RFC determination, on the issue of walking, for failure to apply the correct legal standard and because it is not supported by substantial evidence.

With regards to lifting, carrying, pushing, and/or pulling, the Court first notes there is no indication in the ALJ's narrative that he considered each of these separately, even if he intended to combine them in one or more combinations, when determining Clay's RFC.  *See* SSR 96-8p para. 20.  In fact, he does not mention pushing or pulling at all in his narrative.[42]  The Court thus reverses the ALJ's RFC determination, on the issues of lifting, carrying, pushing, and pulling, for failure to apply the correct legal standard.

With regards to lifting and carrying, the Court notes the ALJ appeared to draw the most support for concluding Clay could lift or carry 20 pounds maximum and 10 pounds repetitively, from Dr. St. John's September 10, 2002 examination.  While it was a fairly detailed and thorough examination, it was done two to two-and-half years prior to the onset dates of her severe impairments, and it was three-and-a-half years prior to her hearing.  While the Court agrees the ALJ properly weighted Clay's physicians' opinions, *relative to each other*, nonetheless, whether these opinions are considered in isolation or in the aggregate, they do not comprise substantial evidence to support a maximum capacity of 10 pounds versus 20 pounds.  That is to say, there is substantial evidence to find Clay's maximum capacity is within this *range of possibilities*, but there is not substantial evidence to *precisely* identify whether it is specifically 10 or 20 pounds.  Nor will the Administrative Record allow for any greater precision without more data on this topic, either by

---

[41]    The Administrative Record is silent, however, as to how often Clay encounters stairs, and in what number of steps and flights.

[42]    He did utilize these concepts at Clay's hearing, however, as discussed *supra* in note 40.  This does not substitute, however, for analyzing them in his narrative.

recontacting Clay's physicians, or more ideally, obtaining current lift and carry capacities. The Court thus reverses the ALJ's RFC determination, on the issues of lifting and carrying, as there is not substantial evidence to support it.[43]

With regards to the ALJ's functional determination based on the medical limitation of Clay's migraines and flares, as it turned on his improper determination of Clay's credibility, the Court reverses this functional determination, for failure to apply the correct legal standard and because it is not supported by substantial evidence. *See* part IV.C.2.b *supra*.

Likewise, as the ALJ's functional determination that Clay could stoop frequently but not continuously turned on his determination of Clay's credibility, the Court reverses it for failure to apply the correct legal standard and because it is not supported by substantial evidence. *See* part IV.C.2.b *supra*. In particular, the Court notes the only pertinent evidence the ALJ appeared to analyze regarding Clay's ability to stoop, was her ability to kneel to clean the bottom of the refrigerator, for which the record provides no frequency.

Lastly, because the ALJ failed to consider Clay's records from Alta Bates and West Oakland, he failed to consider her neck pain, depression, mood disorder, and hemorrhoid impairments in determining her RFC, in violation of 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); SSR 96-8p paras. 7, 17-18. *See* part IV.C.1.c.v *supra*. The Court thus reverses the ALJ's RFC determination, on this issue, for failure to apply the correct legal standard.

**V.      The ALJ applied the incorrect legal standard in determining Clay's past relevant work.**

"At the fourth step, [the SSA] considers [its] assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, [the SSA] will find that you are not disabled." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The RFC determination precedes the past relevant work determination. *Id.* §§ 404.1545(a)(5), 416.945(a)(5). Once the ALJ determined Clay's RFC, he proceeded to determine her past relevant work.[44] See AR at 26.

---

[43]       Also, to the extent the ALJ based Clay's lifting and carrying capacity on his credibility determination of her claim she could only lift ten pounds, the Court reverses the ALJ's RFC determination, on this issue, for failure to apply the correct legal standard and because it is not supported by substantial evidence. *See* part IV.C.2.b *supra*.

[44]       The determination of Clay's RFC is discussed *supra* in part IV.

"Past relevant work" is work a claimant performed within the past 15 years, that was SGA, and that lasted long enough for them to learn to do it. *Id.* §§ 404.1560(b)(1), 416.960(b)(1). The determination may involve evidence provided by the claimant, persons familiar with their work, vocational experts, or Department of Labor materials, such as the Dictionary of Occupational Titles. *Id.* §§ 404.1560(b)(2), 416.960(b)(2). The determination does not involve a claimant's "vocational factors of age, education, and work experience or whether [their] past relevant work exists in significant numbers in the national economy." *Id.* §§ 404.1560(b)(3), 416.960(b)(3).

As defined by the SSA:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id.* §§ 404.1567(a), 416.967(a).

In contrast:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

*Id.* §§ 404.1567(b), 416.967(b).

In contrast, "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.* §§ 404.1567(c), 416.967(c).

In this case, the parties argued about whether Clay could perform sedentary or light work. *See* Mot. at 15:9-16:21 (ALJ's improper weight of medical opinions caused an improper past relevant work determination); Opp'n at 7:22-8:18 (disagreeing with Clay's analysis). The parties

1   failed to realize, however, the issue was moot, as the ALJ had failed to apply the correct legal

2   standard for determining Clay's past relevant work.

3          At Clay's hearing, the ALJ put the following question to the vocation expert:

4          I have some hypothetical questions for you, as you answer these *please assume a*

5          *person of the same age, education and experience as the clamant has*.  And for the

6          first hypothetical assume further that the person can lift and carry ..., can stand and

7          walk ..., and can sit ....  Would a person with these limitations be able to perform any

8          of the claimant's past work ...?

9   AR at 292 (emphasis added).[45]

10         After the expert's answer, the ALJ asked, "As a second hypothetical, assume further that the

11  person cannot lift ....  Would a person with those additional restrictions still be able to perform all of

12  the claimant's past work ...?  *Id.* at 292-93.  After the expert clarified his answer to the first

13  hypothetical, he answered the ALJ's second hypothetical.  *Id.* at 293.  The ALJ then asked, "As a

14  third hypothetical assume in addition to all the limitations stated before for about 10 months of the

15  year the claimant might miss work one day per month because of headaches."  *Id.* at 293.  After the

16  ALJ answered, there was a brief exchange about whether Clay's skills or vocational training would

17  transfer to the sedentary level.  *Id.* at 293-94.

18         The ALJ then asked, "As a fourth hypothetical, assume in addition all the limitations stated

19  before, that the person cannot lift, push ....  Could a person with those limitations still be able to

20  perform all of the claimant's past work ...?  *Id.* at 294.  The ALJ answered in the negative.  *Id.*  The

21  ALJ then asked the expert to consider whether Clay could perform "other jobs," taking into account

22  her vocational training.  *Id.*  After a short discussion on this issue, *id.* at 294-95, the ALJ asked, "As

23  a fifth hypothetical, assume in addition to all the restrictions stated before that the person can lift and

24  carry ....  Would that erode any of the numbers you gave after the fourth hypothetical?"  *Id.*

25  at 295-96.  The expert answered, and the questioning shifted to claimant's attorney.  *Id.* at 296.

26  ///

27  _____

28  [45]      For brevity, the Court has omitted the capacity details as they are irrelevant to the issue at hand.

42

1    For every hypothetical, the ALJ had the vocational expert "assume a person of the same age,

2    education and experience as the clamant has."  *See* AR at 292.  Then, in his narrative, the ALJ made

3    it clear his determination as to what past relevant work Clay could do, turned *entirely* on the

4    "testimony of the vocational expert."  AR at 26 para. 4.  While vocational factors may be considered

5    for the fifth-step determination of "other work," *see* 20 C.F.R. §§ 404.1560(c), 416.960(c), *this is*

6    *absolutely prohibited for the fourth step determination of "past relevant work," see id.*

7    §§ 404.1560(b)(3), 416.960(b)(3) (determination does not involve a claimant's vocational factors of

8    age, education, or work experience); *Garcia v. Sec'y of Health and Human Servs.*, 46 F.3d 552,

9    555-56 (6th Cir. 1995); *Williams v. Sullivan*, 970 F.2d 1178 (3d Cir. 1992), *reh'g denied*, *cert.*

10   *denied*, 507 U.S. 924 (1992); 55 Fed. Reg. 11009, 11009-10 (Mar. 26, 1990) (Amendments in 1990,

11   to § 404.1560 and § 416.960, expressly stating principle, merely restated longstanding SSA policy

12   of not considering vocational factors when considering past relevant work in the fourth step of its

13   five-step disability analysis.).

14   Because the ALJ applied the wrong legal standard, when he used vocational factors to

15   determine Clay's past relevant work, the Court reverses his determination and remands for a

16   determination under the correct legal standard.  In remanding the Court notes SSR 82-62 states,

17   "[w]hen deciding whether a claimant is disabled under title II or title XVI, the 15-year period is

18   generally the 15 years prior to the time of adjudication at the initial, reconsideration or higher

19   appellate level."  SSR 82-62 para. 9 ¶ 1.  The Court further notes at her hearing the ALJ considered

20   Clay's work as a housekeeper from 1987 through 1989, even though 15 years prior to her hearing

21   was March 2, 1991.[46]  *See* AR at 76, 291.  On remand, under SSR 86-26, any determination of

22   Clay's past relevant work should be limited to the 15 years prior to her administrative hearing on

23   remand, unless the ALJ explains in his narrative the grounds for exceeding such period.  *See* SSR

24   82-62 para. 8.

25   ///

26

27

28

---

[46]   Because the ALJ ultimately disregarded Clay's housekeeper work as too strenuous, in
determining what past relevant work she could do, AR at 26 para. 4, his initial consideration of such
work is not grounds for reversal.

1    **VI.       The Court remands for further development of the Administrative Record.**

2            Clay requests as relief that the Court remand for an immediate determination of benefits,

3    alleging there is no need to further develop the Administrative Record, under *Benecke v. Barnhart*,

4    379 F.3d 587, 593 (9th Cir. 2004).  Mot. at 17:25-19:3.  The SSA opposes.  Opp'n at 13 n.7.  As

5    there is clearly a need to further develop the record, the Court declines Clay's request to remand for

6    an immediate award of benefits.

7                                          **CONCLUSION**

8            Accordingly, the Court GRANTS Deborah R. Clay's Motion for Summary Judgment

9    [Docket No. 15], DENIES defendant's Cross Motion for Summary Judgment and in Opposition to

10   Plaintiff's Motion for Summary Judgment [Docket No. 17], REVERSES defendant's decision

11   regarding whether Clay is eligible for disability or supplemental security income benefits, and

12   REMANDS this matter back to defendant to take certain actions, including holding an

13   administrative hearing to redetermine Clay's RFC and past relevant work, in accordance with the

14   Court's findings and conclusions stated herein.  Such actions shall include, but are not limited to,

15   properly considering Clay's medical records generated by Alta Bates Summit Medical Center and

16   West Oakland Health Council; determining whether Bruce Thompson, M.D. was Clay's treating

17   physician, under *Benton v. Barnhart*, 331 F.3d 1030 (9th Cir. 2003), and if so, recontacting him to

18   clarify his medical opinions; and, if Dr. Thompson so qualifies for recontact, but defendant is

19   unsuccessful in recontacting him, then arranging for a consultative examination.

20           IT IS SO ORDERED.

21

22   March 31, 2008                        _Saundra B Armstrong_____
                                           Saundra Brown Armstrong
23                                         United States District Judge

24

25

26

27

28

                                              44